UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

Darius Doukoure,

                          Plaintiff,

— against —

The City of New York, Aaron Capa, Gregory
Carosella, Michael Levinsky, and Michael
Simone,

                          Defendants.

Case No. 24-cv-1834

<u>COMPLAINT</u>

JURY TRIAL DEMANDED

## **<u>NATURE OF THE ACTION</u>**

1.      This is an action for false arrest, fabrication of evidence, malicious

prosecution, and excessive force that arose when police officers in the New York City

Police Department responded to a complaint from an agitated woman, suffering from

dementia, who made verifiably false accusations against her eighteen-year-old

grandson, Plaintiff Darius Doukoure.

2.      Plaintiff, a teenager grieving the recent loss of his mother who died

recently of cancer, had become the unwitting babysitter of his declining grandmother.

3.      When his grandmother wandered into the home of their neighbor

and claimed Plaintiff had attacked her, the police were contacted.

4.      Although Plaintiff cooperated with police to allow them into his

home to investigate the story his grandmother had conjured, and facilitated them

speaking with other family members who confirmed her compromised state of mind,

police decided to place Plaintiff under arrest, and then needlessly tasered him when he objected, asking "for what."

5.    Plaintiff was tased, assaulted, arrested, and falsely charged with assaulting his grandmother.

6.    Police provided false and critically incomplete information to the prosecutors to charge Plaintiff with felony assault.

7.    The spring that Plaintiff should have been finishing high school, he spent a week on Rikers Island, and attended court dates until charges – that should never have been brought – were ultimately dismissed against him.

8.    In June 2023, instead of getting a diploma, he got a certificate of disposition dismissing all charges against him.

## JURISDICTION AND VENUE

9.    This action arises under 42 U.S.C. §§ 1983 and 1988 in addition to the laws of the State of New York.

10.    Jurisdiction lies in this Court over claims against employees of the New York City Police Department under its federal question and civil rights jurisdiction, 28 U.S.C. §§ 1331 and 1343.

11.    Venue is proper in this Court under 28 U.S.C. § 1391 because Plaintiff's claims arose within the Eastern District of New York.

## PARTIES

12.    Plaintiff Darius Doukoure is a resident of New York City.

13.     Defendant Gregory Carosella is a NYPD police officer living in New York.

14.     Defendant Michael Levinsky is an NYPD police officer living in New York.

15.     Defendant Michael Simone is an NYPD police officer living in New York.

16.     Defendant Aaron Capa is an NYPD police officer living in New York.

17.     Defendant City of New York is a municipal corporation in the State of New York.

## GENERAL ALLEGATIONS

18.     On Saturday, March 11, 2023, Plaintiff Darius Doukoure was home alone at his home in Staten Island, New York, when NYPD officers knocked at his door.

19.     He had already been having a hard year.  His mother died of cancer in the fall of 2022.  His brother had moved out of the home.

20.     Plaintiff's grandmother, who lived in the home with Plaintiff, was not doing well.  She suffered from dementia and had been decompensating precipitously since the death of her daughter.  She was prone to wandering, and agitated, disorganized ramblings.  The episodes had become more frequent and harder to manage.

21.     Plaintiff was a senior in high school, hoping, despite everything happening in his life, to attend enough days of school to graduate.

22.     Though Plaintiff's maternal aunt had moved into Plaintiff's home to help care for Plaintiff and his grandmother after his mother passed, she returned home for a visit at the beginning of March 2023, leaving Plaintiff and his ailing grandmother on their own.

23.     When Plaintiff's aunt left Staten Island, she instructed Plaintiff to keep his grandmother at home and not to let her out go outside.  She told him to keep the doors locked and to call the police if she got out again.

24.     On the morning of Saturday, March 11, 2023, Plaintiff's grandmother, Carol Redd, was disoriented, talking about boys in the room, though there were no boys there.  She was going on and on, not making sense.

25.     Plaintiff's grandmother began pacing around the ground floor of their house, saying she was leaving.  She tried to open the front door.  The door had two locks, and she kept turning one of them, appearing to not understand why the door would not open.

26.     Plaintiff picked her up at her waist and moved her away from the door and put her back down, re-locking the door.

27.     His grandmother then went to the back door and began doing the same thing.  Trying to unlock and open the door so she could leave. Plaintiff, again, picked her up by the waist and moved her away from the door.

28.     Plaintiff and his grandmother went back and forth like this for a while.  Between the doors.

29.   His grandmother was getting more and more worked up as time passed.  She became angry with Plaintiff for keeping her inside, insisting she needed to leave.

30.   Plaintiff, eighteen years old and hitting his limit, eventually got frustrated and relented.  He walked over to the front door and opened it, saying if you want to go, just go.  He went upstairs and watched YouTube clips.

31.   Minutes later, the police arrived at Plaintiff's front door.  Officer Gregory Carosella and his partner, Michael Levinsky, stood in front of him, asking to come inside.

32.   What began as a calm and professional investigation, turned into a violent and unnecessary arrest that caused Plaintiff considerable pain, lost liberty, and derailed his young life.

33.   Before the officers knocked on Plaintiff's door, Officer Carosella had already spoken with Plaintiff's grandmother, Ms. Redd, at their next-door neighbor's home.

34.   Ms. Redd had told the officers, "he threw the bottom of the toilet stool and it hit me in my head."  Ms. Redd pointed to the top of her head indicating where she had been injured. She indicated the person who had injured her was her grandson, Darius Doukoure.

35.   When Officer Carosella asked Ms. Redd if Plaintiff was home, she said, "he's supposed to be," and followed it up by saying, "go in the basement, there some people down there."

36.     When asked how many people were in the basement, she began mumbling about people in the basement, then stated, "they know how to hide."

37.     When Officer Carosella asked Ms. Redd what happened before she was hit, she told him they were arguing, that Plaintiff was trying to keep her from coming outside to the phone company.

38.     Officer Carosella then went to Plaintiff's house and knocked on the front door.  Plaintiff said it was cold and did not want to come outside, but asked the officers if they wanted to come in.

39.     When the officers entered Plaintiff's house, they began questioning him about what happened.

40.     Plaintiff, exasperated, told them that his grandmother was having a temper tantrum, saying "she has these all the time." Adding, that just yesterday he had found his grandmother at the 76th bus stop for no reason.

41.     He explained he talked to his aunts about this because it happens all the time and that he had been told not to let her leave the house.

42.     Officers asked him why she cannot leave the house.  Plaintiff explained his grandmother has dementia.

43.     When asked what happened today, Plaintiff told them that his grandmother was trying to leave the house for no reason.  Officers asked Plaintiff what happened?  Plaintiff said, nothing.

44.     Officers asked if there was a physical altercation.  Plaintiff said emphatically, "there was no-- there was physical altercation. She is sitting here trying to

leave the house. I'm telling her she doesn't have nowhere to do.  Her sister told me she cannot leave the house.  That's what I'm following."

45.     Plaintiff explained that when his grandmother was trying to leave the house that day, she was saying that there was someone upstairs in the room, when there was no one in the room and talking about people in the basement, when there was no one in the basement.

46.     The officers asked to speak to Plaintiff's aunt to verify that his grandmother had dementia.  Plaintiff called his aunt, who lives in Buffalo, and handed the officers his phone.

47.     Officer Carosella spoke to Plaintiff's aunt, who stated multiple times that her mother, Ms. Redd, has dementia.  She explained her mother has a lot of medical issues and is awaiting the official diagnosis for dementia, but that she suffers from dementia and has been having more frequent episodes since her daughter's death.

48.     Plaintiff's aunt explained she had been coming back and forth from Buffalo, since Plaintiff's mother passed away, and they had been trying to get Ms. Redd to the doctor to address her medical and cognitive issues that she had been neglecting while Plaintiff's mother was in the hospital.

49.     As a result of the delay seeking necessary treatment and obtaining an official diagnosis, Plaintiff's grandmother was not yet getting medication she likely required and did not have the professional care she clearly needed.

50.     When Officer Carosella explained the allegation that Ms. Redd had made against Plaintiff, that she had thrown a toilet seat cover at her, Plaintiff's aunt sighed, saying "that's definitely dementia related."

51.     While Officer Carosella was on the phone with Plaintiff's aunt, Officer Levinsky told two of the other officers, Officer Orlando and Officer Sharov, to go back next door to ask Ms. Redd exactly what happened.

52.     While they were gone, Officer Levinsky asked Plaintiff, again, what happened in terms of a physical altercation.  Plaintiff said, "she kept trying to open the back door, so I picked her up to move her. But ain't nothing happened."

53.     Plaintiff said his grandmother did not fall or hit her head or anything, that he made sure of that.  He went on to explain that yesterday, when he had found her at the bus stop, it had taken him an hour and a half to get her home.

54.     While Officers Carosella, Levinsky and Capa, stayed in the house with Plaintiff, Officers Orlando and Sharov walked back to the neighbor's home to question Ms. Redd further.

55.     When Officers Orlando and Sharov arrived there, Ms. Redd was being examined by EMS.

56.     Ms. Redd said she got hit with a portable toilet stool.  The EMS technician asked Ms. Redd to clarify if she meant the toilet seat, and she said the bottom part.  The technician then clarified in front of Ms. Redd, "the bottom part of the toilet seat, she told us."

57. Officer Orlando asked Ms. Redd what happened, and she said he was arguing with her about going outside and she kept trying to go outside, and then he said I'm tired of you, and went upstairs and threw the thing at her.

58. Officer Orlando asked Ms. Redd if she was injured and if she was in pain and she pointed to the left side of her cheek.

59. Officer Orlando returned to Plaintiff's house and repeated the statement that Ms. Redd made about the toilet seat cover to Officer Levinsky.

60. Officer Levinsky then informed Sergeant Simone that Officer Carosella was on the phone with Plaintiff's aunt confirming that Ms. Redd suffered from dementia.

61. Sergeant Simone walked to the neighbor's home, with Officer Sharov trailing behind him. Again, he asked Ms. Redd what happened. Ms. Redd stated she got hit with a toilet stool and that her grandson threw it at her.

62. Sergeant Simone asked Ms. Redd where he put the toilet stool after he threw it. Ms. Redd stated over by the couch near the window. Ms. Redd asked the EMS technician if he had seen anybody in the basement.

63. Sergeant Simone directed Officer Sharov to go look in the house where Ms. Redd had directed and in the bathrooms to see if she could find the alleged toilet stool or toilet seat cover.

64. Officer Sharov returned to Plaintiff's home and repeated the information Ms. Redd had stated regarding the toilet seat cover. The officers searched the area, but did not find the alleged toilet seat cover.

65.     Officers stood around Plaintiff's living room calmly speaking to Plaintiff, who sat on the stairs in his pajamas, frustrated, but cooperative.

66.     Officers asked if there was anyone else in the house, Plaintiff said there was not, allowing the officers free reign to check the house.

67.     Plaintiff showed the officers each of the three bathrooms to confirm no toilet seat covers were missing.  The officers confirmed the toilet seats were all intact.

68.     While Plaintiff showed one of the officers around his house, Officers Carosella, Levinsky, and Capa, discussed the incredibility of Ms. Redd's claims, in light of what they now knew about her cognitive impairment as well as the search of the home, which revealed nothing amiss in the bathrooms and none of the people Ms. Redd claimed were in the upstairs or in the basement, as well as what they had experienced with prior encounters with Ms. Redd.

69.     While Officer Sharov and the others searched Plaintiff's home, Sergeant Simone stayed with Ms. Redd, asking her why her grandson did this to her.

70.     Ms. Redd gave a rambling answer about her grandson going to the phone company and that she could hear really well what the people in the basement were saying, about calling the police and putting her in something and them losing their home.

71.     When Sergeant Simone asked her who she was referring to in the basement, she said they are down there, squatters.

72.     Sergeant Simone said he would go check out the basement.  As he walked back to Plaintiff's house, he walked with another officer who indicated the same

thing had happened the last time he had been to this home a while ago, an incident where Ms. Redd claimed he was trying to put her phone in his name.

73.     When Sergeant Simone returned to Plaintiff's home, Officer Sharov confirmed all the toilet seats were on the toilets.  The other officers confirmed they had searched the home, and no one was in the basement or upstairs.

74.     Officer Carosella then stepped outside with Sergeant Simone and recapped what he had learned from his conversation with Plaintiff's aunt, as well as the search of the home.

75.     Officer Carosella pointed out that as there was no toilet seat cover missing, and no one in the basement, and the complaining witness suffers from dementia, clearly indicating he did not believe there was probable cause to make an arrest.

76.     Sergeant Simone responded that the problem they have is that because the grandmother is not officially diagnosed, and because she made a statement alleging she had been assaulted.

77.     Sergeant Simone trailed off, struggling with what to do in light of all the conflicting information Ms. Redd alleged.

78.     Sergeant Simone then stated they should arrest Plaintiff.

79.     Officer Carosella responded that he understood, but raised the additional concern that Ms. Redd likely would not cooperate with the ADA.

80. Sergeant Simone indicated agreement, that she most likely would not cooperate, and the case will be dropped. Nonetheless, he decided to move forward with the arrest.

81. When the officers returned to the house, Officer Carosella motioned to his partner, Officer Levinsky, that they were going to make an arrest.

82. Officer Levinsky turned to Plaintiff, contrite, and almost apologetic, saying he is under arrest.

83. Plaintiff immediately began asking, "for what?"



84. When the officers asked him to stand up, Plaintiff began panicking, saying not to touch him and that he wanted to call his aunt.

85. When Plaintiff began to back away to call his aunt, officers surrounded him, grabbing at his limbs and body.



86.     All the while, Plaintiff repeatedly said, "I didn't do nothing." Sergeant Simone took out his taser and began tasing him.  Plaintiff screamed out in agony and fell to the ground.



87.     At the same time that Sergeant Simone tased Plaintiff, Officer Capa took out his taser and also tased Plaintiff.

88.     Plaintiff immediately fell to the floor when the tasers connected with his body, and he screamed in pain.

89.     Officer Sharov handcuffed him, and officers walked him to the ambulance to be transported to the hospital.

90.     Plaintiff continued screaming in pain and repeating that he did not do nothing.

91.     Plaintiff was transported to Staten Island Medical Center where he was examined for the electrocution injury and to have the taser barbs removed.

92.     At the hospital, medical personnel monitored Plaintiff's heart and removed the three taser barbs from Plaintiff's body, including one that was lodged in his left groin and two in his lower back.

93.     Plaintiff was then taken from the hospital to the 120 Precinct for processing, where he spent the night.

94.     On March 12, 2023, Plaintiff was then taken to Richmond criminal court where he was charged with felony assault in the second degree, resisting arrest, obstructing governmental administration in the second degree, assault in the third degree, criminal possession of a weapon in the fourth degree, and harassment in the second degree.

95.     In the complaint, Officer Carosella swore that Carol Redd informed him that Plaintiff caused her physical injury "by means of a dangerous instrument, namely, a toilet foot stool."

96.     In Officer Carosella's arrest report, he wrote, "Perp did admit in spontaneous utterance to physical altercation," despite Plaintiff adamantly denying there being a physical altercation and maintaining, throughout the extensive encounter with the officers prior to his arrest, that he had not done anything to harm his grandmother.

97.     In the Domestic Incident Report that Officer Levinsky completed, he wrote, Plaintiff "admits in spontaneous utterance to physical altercation," though no such admission was made and in spite of the fact that when Officer Levinsky asked Plaintiff directly what physical altercation occurred, Plaintiff told him that he had picked his grandmother away from the door to prevent her from leaving.  But that nothing else had happened.

98.     Nowhere in the arrest reports or official paperwork did any of the officers record Ms. Redd's statements about the toilet seat cover being used to hit her, or that there were people squatting in the basement or upstairs.

99.     The reports were supervised and approved by Sergeant Simone.

100.     Officers also failed to note that Ms. Redd suffered from dementia, as alleged by Plaintiff and corroborated by his aunt.

101.     Rather than provide objective, accurate information about what had been gleaned from the extensive investigation into Ms. Redd's allegations, the officers provided misleading information with glaring omissions to ensure Plaintiff would be charged and prosecuted.

102.     Following Plaintiff's arraignment on the felony assault charges, he was unable to afford the bail that was set.

103.     He was transferred to Rikers Island.

104.     On March 14, 2023, three days after Plaintiff was charged and bail was set, the Assistant District Attorney, Anthony Accardo, spoke with Ms. Redd, who informed him that on March 12, 2023, she was struck in the head by a toilet stool, but not by Plaintiff.  She claimed that an unnamed individual who resides in her basement was the one who did it.

105.     Plaintiff remained on Rikers Island for two more days.

106.     On March 16, 2023, Plaintiff appeared before the grand jury and testified on his behalf.

107.    The grand jury declined to indict Plaintiff on any of the assault charges pending against him and only indicted him on the resisting arrest charge.

108.    Plaintiff was released following the grand jury's determination.

109.    After spending nearly a week in custody, and missing enough days of school to prevent Plaintiff from successfully graduating, Plaintiff did not return to high school.  He dropped out.

110.    On May 1, 2023, Plaintiff appeared for his next scheduled court date in Richmond Criminal Court.

111.    On that date, all of the charges regarding Plaintiff's grandmother were dismissed when a superseding complaint was filed against Plaintiff, charging him with resisting arrest only.

112.    On June 15, 2023, Plaintiff returned to court for the final time.  On that date, he was granted an ACD for the resisting arrest charge, and was told to stay out of trouble.  He was not required to return to court again, and the matter was dismissed and sealed.

### FIRST CAUSE OF ACTION
Excessive Force
42 U.S.C. § 1983 and New York City Admin Code § 8-801 et seq.
*Against All Defendants*

113.    Plaintiff incorporates by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

114.    Defendants collectively used force against Plaintiff that was unjustified and objectively unreasonable, taking into consideration the facts and circumstances that confronted Defendants.

16

115.    The types and levels of force Defendants used against Plaintiff were unjustified and objectively unreasonable, taking into consideration the facts and circumstances that confronted Defendants.

116.    Defendants Simone and Capa used unreasonable force against Plaintiff in tasing him.

117.    As a result of Defendants' acts and omissions, Defendants deprived Plaintiff of his federal, state, and/or other legal rights; caused Plaintiff bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiff to expend costs and expenses; and/or otherwise damaged and injured Plaintiff.

## SECOND CAUSE OF ACTION
Fabrication of Evidence and Denial of the Right to a Fair Trial Under the Fifth and Fourteenth Amendments And 42. U.S.C. § 1983
*Against Defendants Carosella, Levinsky, and Simone*

118.    Plaintiff repeats and realleges each and every allegation set forth above.

119.    At all times, the Defendants were acting under color of State law.

120.    The Fifth and Fourteenth Amendments protect the right to be given a fair trial and not to have false evidence presented against you.

121.    Defendants collectively made false statements in reports provided to prosecutors which led to the prosecution of Plaintiff.

122.    Defendants Carosella, Levinsky, and Simone made false statements in their arrest reports stating that Plaintiff admitted to having a physical altercation

with his grandmother, despite the fact that Plaintiff emphatically denied having a physical altercation to both Defendants, multiple times.

123.    Defendants Carosella, Lewinsky, and Simone each spoke to the complaining witness, Ms. Redd about the allegations.  Ms. Redd made statements to each of the Defendants about an alleged toilet seat, toilet stool, or toilet seat cover, as being the object used to harm her.

124.    Each of the Defendants confirmed that no such object could be found in Plaintiff's home or any such object to be missing from any of the bathrooms in Plaintiff's home.

125.    Ms. Redd also made statements Defendants Carosella, Levinsky, and Simone that there were squatters in her basement and people upstairs, which Defendants also learned to be untrue.

126.    Each of the Defendants also learned that Ms. Redd suffered from dementia.

127.    Yet, none of that information was included in the arrest paperwork or shared with prosecutors, in order to prosecute Plaintiff.

128.    But for forwarding the fabricated, misleading, and glaringly incomplete evidence Plaintiff would not have been arraigned on charges concerning Plaintiff's grandmother.

129.    Indeed, once a more complete picture with accurate information was presented to the grand jury, they did not indict on any of the charges concerning Plaintiff's grandmother.

130.     By including false and misleading information about the alleged weapon, Defendants caused Plaintiff to be charged with felony assault, for which considerable bail was set.

131.     Together, by forwarding false information to the prosecutors that was likely to influence a jury verdict, the Defendants deprived the Plaintiff of his liberty and property.

## THIRD CLAIM FOR RELIEF

Malicious Prosecution Under 42 U.S.C. § 1983 and
New York City Admin Code § 8-801 *et seq.*
*Against Defendants the City of New York, Simone, Levinsky, and Carosella*

132.     Plaintiff incorporates by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

133.     Defendants Simone, Levinsky, and Carosella commenced a criminal prosecution against plaintiff by drafting paperwork alleging that Plaintiff committed crimes, they did not have probable cause to believe he in fact committed.

134.     The criminal action terminated in favor of Plaintiff: all of the charges related to Plaintiff's grandmother and assaulting an officer were dismissed when a superseding complaint was filed on May 1, 2023, that included only the charge of resisting arrest. The resisting arrest charge was dismissed on June 15, 2023, pursuant to an ACD.

135.    Defendants induced prosecutors to include the charge of resisting arrest, despite the fact that Plaintiff's arrest, itself, was unlawful as there was not probable cause to believe he committed a crime.

136.    Defendants acted with actual malice in that they commenced a criminal proceeding despite the fact they had conducted a thorough investigation that led them to conclude there was no probable cause to make the arrest or charge Plaintiff with any crimes.

137.    Plaintiff suffered a post-arraignment loss of liberty in that he was incarcerated on Rikers Island for five days.

## FOURTH CLAIM FOR RELIEF

False Arrest Under 42 U.S.C. § 1983 and
New York City Admin Code § 8-801 *et seq.*
*Against Defendants City of New York, Simone, Levinsky, and Carosella*

138.    Plaintiff incorporates by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

139.    Defendants had no judicial warrant authorizing them to seize Plaintiff.

140.    Defendants collectively seized Plaintiff, restricting his freedom of movement, without privilege or lawful justification.

141.    Plaintiff was conscious of his confinements by Defendants.

142.    Plaintiff did not consent to his confinements by Defendants.

143.    It was unreasonable for Defendants to believe that they had lawful cause to seize, detain, or arrest Plaintiff.

144.    Thus, Defendants did not have individualized probable cause to seize, detain, or arrest Plaintiff.

145.    Even if Defendants at one point had probable cause, the probable cause dissipated upon Defendants Levinsky, Carosella, and Simone speaking to Ms. Redd, investigating that the claims she made about the alleged assault, and concluding that all evidence revealed the allegations to be incredible, and that Ms. Redd was not in sound state of mind when she made them.

146.    Defendants made the determination to arrest Plaintiff after conducting the investigation and determining that the allegations were not credible.

147.    Those Defendants who ordered, effected, and otherwise participated in arresting Plaintiff subjected Plaintiff to unlawful seizures, false arrests, and/or searches and/or seizures of his persons and/or property.

WHEREFORE, Plaintiff Darius Doukoure demands judgment against the above-captioned Defendants as follows:

a.    For compensatory damages, jointly and severally, in an amount to be determined at trial, but not less than two million dollars;

b.    For punitive damages, jointly and severally, in an amount to be determined at trial;

c.    For reasonable attorneys' fees, costs, and disbursements, under 42 U.S.C. § 1988 and other applicable laws;

d.    For pre- and post-judgment interest as allowed by law; and

e.   For such other relief as this Court deems just and proper.


Dated:  New York, New York
        March 12, 2024


                              WERTHEIMER LLC


                        By: _____
                              Mara Fleder
                              Joel A. Wertheimer
                              14 Wall Street, Suite 1603
                              New York, New York 10005
                              (646) 720-1098
                              mara@joelwertheimer.com
                              joel@joelwertheimer.com